# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

| | | |
|---|---|---|
| ROJEANNA JOSEPHINE LOPEZ, | | |
| Plaintiff, | | No. C12-3070-LTS |
| vs. | | **MEMORANDUM** |
| CAROLYN W. COLVIN, Commissioner of Social Security, | | **OPINION AND ORDER** |
| Defendant. | | |

---

## *Introduction*

Plaintiff Rojeanna Josephine Lopez seeks judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for disability insurance benefits (DIB) and supplemental security income (SSI) pursuant to Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3). Lopez contends the administrative record (AR) does not contain substantial evidence to support the Commissioner's decision that she is not disabled. For the reasons discussed below, the decision must be affirmed.

## *Background*

Lopez was born in 1972 and completed high school and cosmetology school. AR 134-40, 191-92. She previously worked as a cashier, fast food worker and hairdresser. AR 293. Lopez filed for DIB and SSI on March 22, 2010, alleging disability beginning on October 31, 2009,[1] due to fibromyalgia, syncope, hypotension/low blood pressure, depression, left hip pain, migraines, stress and low

---

[1] Lopez amended her onset date to March 12, 2010, during the administrative hearing. AR 47.

blood sugar. AR 134-40, 190-91. Her claims were denied initially and on reconsideration. AR 67-70. Lopez requested a hearing before an Administrative Law Judge (ALJ). AR 90. On March 22, 2012, ALJ Julie Bruntz held a hearing via video conference during which Lopez and a vocational expert (VE) testified. AR 43-66.

On April 26, 2012, the ALJ issued a decision finding Lopez not disabled since March 12, 2010. AR 21-35. Lopez sought review of this decision by the Appeals Council, and submitted additional evidence, but the Appeals Council denied review on July 30, 2012. AR 4-11. The ALJ's decision thus became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481.

On September 27, 2012, Lopez filed a complaint in this court seeking review of the ALJ's decision. On October 23, 2012, with the parties' consent, United States District Judge Mark W. Bennett transferred the case to me. The parties have briefed the issues and the matter is now fully submitted.

## *Summary of ALJ's Decision*

The ALJ made the following findings:

(1)     The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.

(2)     The claimant has not engaged in substantial gainful activity since March 12, 2010, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

(3)     The claimant has the following severe impairments: pseudoseizures; obesity; major depressive disorder, recurrent, moderate; anxiety disorder; and conversion disorder (20 CFR 404.1520(c) and 416.920(c)).

(4)     The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

2

(5) After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she would need to avoid hazards such as moving machinery and unprotected heights. There can be only occasional changes in the work setting; she is limited to simple, routine tasks; and she can have only short-lived superficial contact with the public, coworkers, and supervisors.

(6) The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

(7) The claimant was born on March 14, 1972 and was a younger individual age 18-49 on the amended alleged disability onset date (20 CFR 404.1563 and 416.963).

(8) The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

(9) Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

(10) Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

(11) The claimant has not been under a disability, as defined in the Social Security Act, from March 12, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

AR 23-35.

In analyzing Lopez's residual functional capacity (RFC), the ALJ discussed Lopez's medical history. She summarized her impairments and the tests she had undergone following her first pseudoseizure. AR 25-26. She also analyzed the results of the consultative examination performed by Michael Stitt, M.D., in August 2010.

3

AR 26. Lopez reported to Dr. Stitt that she suffered from syncope, narcolepsy, pseudoseizures and fibromyalgia. During his physical examination, Dr. Stitt found that her range of motion was mostly normal with only some decrease in neck motion and pain with straight leg raise on the left side. *Id.* He assessed her with fainting, fibromyalgia, narcolepsy and conversion disorder with seizures. He concluded that she was unable to bend, lift, twist, climb, stoop, kneel, or lift/carry any weight. She also could not handle objects and would not do well with hazards. The ALJ found that Dr. Stitt's opinion was inconsistent with the objective medical findings from his evaluation. She noted that Dr. Stitt had diagnosed Lopez with fibromyalgia even though he found that she had little to no tender points. He also concluded she was unable to do many physical work-related activities even though he found her range of motion was essentially normal. *Id.* Due to these inconsistencies, the ALJ gave his opinion little weight.

The ALJ also considered the state agency consultants' opinions. Dr. Melodee Woodard reviewed Lopez's records relating to her physical impairments. She noted that Dr. Stitt's evaluation seemed to reflect Lopez's allegations but was otherwise unsupported by evidence in the record. AR 27. She also found it significant that Dr. Tobon had told Lopez she could "resume normal activities" in March 2010, with no restrictions. *Id.* The ALJ gave Dr. Woodard's opinions some weight for being generally consistent with the record as a whole, but in observing the longitudinal record of evidence, which included obesity, the ALJ found Lopez was more limited than Dr. Woodard opined. AR 28.

Dr. Chrystalla Daly also reviewed Lopez's records relating to her physical impairments and affirmed Dr. Woodard's assessment as written. AR 29. The ALJ gave Dr. Daly's opinion some weight for the same reasons she discussed with regard to Dr. Woodard's opinions. AR 29-30.

Dr. Jennifer Ryan reviewed Lopez's records concerning mental impairments, such as her history of depression and anxiety and her diagnosed pseudoseizures and

conversion disorder. AR 28. The ALJ gave Dr. Ryan's opinion significant weight because it was consistent with the record as a whole. AR 29. In August 2010, Lopez had moderate symptom severity with some fluctuations related to issues with her husband. *Id.* Dr. Ryan reviewed a work performance assessment completed by Lopez's employer in April 2010, which contained generally poor to very poor work performance ratings, with the exception of adequate ability to follow rules, general appearance, and adequate ability to interact with others in the work place. AR 29. The supervisor noted that Lopez lacked motivation overall, but she would be willing to rehire her if her health improved. Dr. Ryan also examined Lopez's function report and a third party report which were generally consistent with each other. *Id.* Lopez alleged problems with memory, concentration and task completion and difficulties in handling stress or changes in routine well. Dr. Ryan concluded that Lopez would be able to carry out simple instructions and perform simple, routine, repetitive work tasks in work environments with consistent work expectations. *Id.*

Dr. Scott Shafer also reviewed Lopez's records concerning mental impairments and affirmed Dr. Ryan's assessment as written. The ALJ gave Dr. Shafer's opinion significant weight for its consistency with the record. AR 30.

Lopez's pseudoseizures began in March 2010 and she continued to experience them in April, June, August and October 2010. AR 29. Additional testing such as a sleep study was recommended as well as weight reduction. The sleep study did not meet the criteria for obstructive sleep apnea and weight loss was recommended. AR 30. In August 2011, while Lopez was undergoing an injection for foot pain, she became light headed and felt faint. *Id.* She explained her pseudoseizure diagnosis to the treating doctor, stating she had done very well recently with only one episode in the past year. The doctor believed Lopez might have had a vaso-vagal reaction that was associated with the pain or discomfort from the injection. No additional pseudoseizures were reported at follow-up appointments in December 2011 and March 2012. *Id.*

5

The ALJ also discussed the evidence from Lopez's treating psychologist, Timi Jordison, Ph.D. Dr. Jordison opined that Lopez had moderate to marked limitations in her ability to deal with work stress, complete and a normal workday or workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. AR 31. She found Lopez was markedly to extremely limited in the ability to accept instructions and respond appropriately to criticism from supervisors or coworkers. *Id.* She also found Lopez was not limited to moderately limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. *Id.* Dr. Jordison estimated Lopez's impairments would cause her to be absent from work three days per month. The ALJ noted that these findings were inconsistent with Lopez's treating records because Dr. Jordison assigned her GAF scores ranging from 57 to 61, which indicate only mild to moderate limitations.[2] Lopez had also consistently reported loving her job and the boost it gave to her self-confidence. The ALJ gave Dr. Jordison's opinion little weight based on the inconsistencies between her treatment records and her extreme opinions indicating Lopez's inability to work, especially considering that Lopez was able to consistently work part-time and loved doing so. AR 31.

The ALJ noted that Lopez had testified at the hearing that her work at Dollar Tree was slower paced than her previous work at a fast food restaurant. Although Lopez alleged she received special accommodations at her job at Dollar Tree, the ALJ

_____

[2] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. *See* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (4th ed.) (DSM-IV). A GAF score of 51-60 indicates the individual has moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers). *Id.* A GAF score of 61-70 indicates the individual has some mild symptoms (*e.g.*, depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (*e.g.*, occasional truancy, or theft within the household), but is generally functioning pretty well and has some meaningful interpersonal relationships. *Id.*

6

found this was unlikely because Lopez had recently been considered for the job of assistant manager. She reasoned that if Lopez was really as anxious and stressed at work as she alleged, she would not have even considered the position.

The ALJ then evaluated Lopez's credibility. She first considered Lopez's daily activities, which Lopez and her sister alleged were fairly limited. AR 32. The ALJ noted that the limited daily activities could not be objectively verified with any reasonable degree of certainty, and even if they were as limited as alleged, it was difficult to attribute that degree of limitation to Lopez's medical condition. *Id.* Therefore, the ALJ considered her daily activities outweighed by other factors.

One of those factors was Lopez's receipt of unemployment compensation after her alleged onset date of disability. *Id.* The ALJ noted that an applicant for unemployment compensation in Iowa must assert that he or she is able to work, available for work, and earnestly and actively seeking work. The ability to work, according to the Iowa Administrative Code, means "[the] individual must be physically and mentally able to work in some gainful employment. . . ." *Id.* The ALJ noted that while applying for unemployment compensation does not prove by itself that the applicant is not disabled, it is compelling and seriously undermines her assertion that she is incapable of working in competitive employment. AR 33.

The ALJ also considered Lopez's current work and the fact that she was being considered for a promotion to assistant manager. *Id.* The ALJ reasoned that although this job did not amount to substantial gainful activity, it indicated that Lopez's daily activities were, at times, greater than she generally reported. *Id.*

The ALJ concluded that her determination of Lopez's RFC took into account the limitations that resulted from Lopez's medically-determinable impairments. *Id.* She found Lopez's allegations were not credible to the extent she asserted she was incapable of all work activity. The ALJ went on to find that Lopez could not perform any of her past relevant work with the RFC provided, but she could perform other work available in the national economy such as a hotel maid, bench assembler, and marker, which

7

were light and unskilled jobs. AR 33-34. For these reasons, the ALJ found Lopez had not been disabled since March 12, 2010. AR 34.

### *Disability Determinations and the Burden of Proof*

A disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505, 416.905. A claimant has a disability when the claimant is "not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists . . . in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant has a disability within the meaning of the Social Security Act, the Commissioner follows a five-step sequential evaluation process outlined in the regulations. 20 C.F.R. §§ 404.1520, 416.920; *see Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). First, the Commissioner will consider a claimant's work activity. If the claimant is engaged in substantial gainful activity, then the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see "whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities." *Dixon v. Barnhart*, 353 F.3d 602, 605 (8th Cir. 2003). "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby*, 500 F.3d at 707; *see* 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c), 416.921(a).

The ability to do basic work activities is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. §§ 404.1521(b), 416.921(b). These abilities

8

and aptitudes include (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. *Id.* §§ 404.1521(b)(1)-(6), 416.921(b)(1)-(6); *see Bowen v. Yuckert*, 482 U.S. 137, 141, 107 S. Ct. 2287, 2291 (1987). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007) (internal quotation marks omitted).

Third, if the claimant has a severe impairment, then the Commissioner will consider the medical severity of the impairment. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, then the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1520(d), 416.920(a)(4)(iii), 416.920(d); *see Kelley v. Callahan*, 133 F.3d 583, 588 (8th Cir. 1998).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, then the Commissioner will assess the claimant's RFC to determine the claimant's "ability to meet the physical, mental, sensory, and other requirements" of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(4), 416.920(a)(4)(iv), 416.945(a)(4). "RFC is a medical question defined wholly in terms of the claimant's physical ability to perform exertional tasks or, in other words, what the claimant can still do despite his or her physical or mental limitations." *Lewis v. Barnhart*, 353 F.3d 642, 646 (8th Cir. 2003) (internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The claimant is responsible for providing evidence the Commissioner will use to make a finding as to the claimant's RFC, but the Commissioner is responsible for developing the claimant's "complete medical history, including arranging for a consultative

9

examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Commissioner also will consider certain non-medical evidence and other evidence listed in the regulations. *See id.* If a claimant retains the RFC to perform past relevant work, then the claimant is not disabled. *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

Fifth, if the claimant's RFC as determined in Step Four will not allow the claimant to perform past relevant work, then the burden shifts to the Commissioner to prove that there is other work that the claimant can do, given the claimant's RFC as determined at Step Four, and his or her age, education, and work experience. *See Bladow v. Apfel*, 205 F.3d 356, 358-59 n.5 (8th Cir. 2000). The Commissioner must prove not only that the claimant's RFC will allow the claimant to make an adjustment to other work, but also that the other work exists in significant numbers in the national economy. *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, then the Commissioner will find the claimant is not disabled. If the claimant cannot make an adjustment to other work, then the Commissioner will find that the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At Step Five, even though the burden of production shifts to the Commissioner, the burden of persuasion to prove disability remains on the claimant. *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

### *The Substantial Evidence Standard*

The Commissioner's decision must be affirmed "if it is supported by substantial evidence on the record as a whole." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006); *see* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").

10

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept as adequate to support a conclusion." *Lewis*, 353 F.3d at 645. The Eighth Circuit explains the standard as "something less than the weight of the evidence and [that] allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal." *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

In determining whether the Commissioner's decision meets this standard, the court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Wester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005). The court considers both evidence which supports the Commissioner's decision and evidence that detracts from it. *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The court must "search the record for evidence contradicting the [Commissioner's] decision and give that evidence appropriate weight when determining whether the overall evidence in support is substantial." *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003) (citing *Cline v. Sullivan*, 939 F.2d 560, 564 (8th Cir. 1991)).

In evaluating the evidence in an appeal of a denial of benefits, the court must apply a balancing test to assess any contradictory evidence. *Sobania v. Sec'y of Health & Human Servs.*, 879 F.2d 441, 444 (8th Cir. 1989). The court, however, does not "reweigh the evidence presented to the ALJ," *Baldwin*, 349 F.3d at 555 (citing *Bates v. Chater*, 54 F.3d 529, 532 (8th Cir. 1995)), or "review the factual record de novo." *Roe v. Chater*, 92 F.3d 672, 675 (8th Cir. 1996) (citing *Naber v. Shalala*, 22 F.3d 186, 188 (8th Cir. 1994)). Instead, if, after reviewing the evidence, the court finds it "possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, [the court] must affirm the [Commissioner's] denial of benefits." *Kluesner*, 607 F.3d at 536 (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). This is true even in cases where the court "might have weighed the evidence differently." *Culbertson*, 30 F.3d at 939 (quoting

11

*Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992)). The court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision." *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984); *see Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005) ("[A]n administrative decision is not subject to reversal simply because some evidence may support the opposite conclusion.").

## Discussion

### A.    *Evaluation of Medical Opinions*

Lopez argues the ALJ erred by not giving more weight to the opinion of her treating source, Dr. Jordison. She argues the ALJ did not provide good reasons for giving Dr. Jordison's opinion little weight and Dr. Jordison's opinion is not inconsistent with her treating records. Lopez also argues it was error for the ALJ to give more weight to the opinions of the state agency consultants, or non-treating sources.

A treating physician's opinion is given "controlling weight" as long as it is "well–supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). A treating physician's opinion is generally entitled to "substantial weight," but such an opinion does not "automatically control" because the ALJ must evaluate the record as a whole. *Wilson v. Apfel*, 172 F.3d 539, 542 (8th Cir. 1999). "It is well established that an ALJ may grant less weight to a treating physician's opinion when that opinion conflicts with other substantial medical evidence contained within the record." *Prosch v. Apfel*, 201 F.3d 1010, 1013-14 (8th Cir. 2000). "Moreover, an ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Id.* at 1014 (internal quotations and citations omitted). "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always

12

give good reasons' for the particular weight given to a treating physician's evaluation." *Id.* at 1013 (quoting 20 C.F.R. § 404.1527(c)(2)).

Lopez suggests Dr. Jordison's opinion is the best evidence of whether she is disabled because she has treated Lopez for almost two years. Lopez began treating with Dr. Jordison on March 24, 2010. AR 626. At that time, she indicated she was stressed out about many things and needed someone to talk to. *Id.* Dr. Jordison diagnosed her with major depressive disorder – recurrent and moderate, and noted the many stressors Lopez was dealing with. She assigned a GAF score of 48.[3] AR 628. Dr. Jordison noted that Lopez made good progress at each session. AR 695-97, 749-60. In May and June 2010, Lopez expressed frustration that her employer only put her down for five hours of work each week. Lopez was working at a fast food restaurant at this time and had blacked out during work in April 2010. AR 640-41, 697. By June 22, 2010, Lopez's GAF score had improved to 55. AR 756. In July, Lopez's husband was released from prison, and her therapy became focused on her relationship issues with him. AR 749-53, 835-57. In late 2010, Lopez's GAF scores ranged from 45 to 50. AR 835-40. In March 2011, Lopez's GAF score was back to 57. AR 841. Dr. Jordison noted she was feeling better and planned to get her cosmetology license back and apply for part-time jobs. AR 841-42. By April 2011, Lopez was working part-time at Dollar Tree. AR 843. Lopez reported during each session that her job was going well. AR 844-56. On August 4, 2011, Lopez's GAF score was 61. She had received praise from her boss and had not experienced any pseudoseizures since working there. AR 850. She constantly reported that she loved her job and the boost to her self-confidence that it gave her. AR 851-57.

Dr. Jordison completed a questionnaire on behalf of Lopez on March 6, 2012. AR 902-09. She assigned a GAF score of 52 and noted that Lopez's mood and

_____

[3] A GAF score of 41 to 50 indicates the individual has serious symptoms or serious impairment in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job, cannot work). DSM-IV at 34.

functioning varied according to her perceptions of treatment by the people around her. She also provided the following narrative:

> She becomes frantic if she is expected to do something at a fast pace and has had pseudo-seizures during these times. She responds very emotionally to perceived criticism. She responds to stress with pseudo-seizures. She has been relatively successful working part-time at the Dollar Tree where she feels her manager respects her and her work, she is able to take frequent breaks, and she is not confronted negatively by customers or co-workers. She responds well to praise and is pleasant, so she generally gets along well with managers, co-workers, and the public when she does not perceive criticism. She has had pseudo-seizures when trying to work full time at a fast pace job (Hardee's). Rojeanna is able to follow instructions, but she responds negatively and defensively to perceived criticism. She is punctual and consistent in work attendance when she works part-time, but her pseudo-seizures caused her to miss work previously. Rojeanna has a good work ethic. Rojeanna's functioning depends a great deal on her current emotional state, which varies a great deal, usually depending on interpersonal relationships within her family or personal life.

AR 902-03. Dr. Jordison also completed a mental RFC questionnaire in which she found that Lopez had moderate to marked limitations in her ability to deal with work stress, complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. AR 907. She also reported that Lopez had marked to extreme limitations in her ability to accept instructions and respond appropriately to criticism from supervisors or co-workers. *Id.* However, she qualified this finding by noting that Lopez was able to accept instructions, but not criticism and would become defensive and/or would shut down when criticized. *Id.*

The ALJ gave Dr. Jordison's opinions little weight based on "the inconsistencies between Dr. Jordison's treatment records and her extreme opinions indicating the claimant's inability to work, especially considering that the claimant was able to

14

consistently work part time and loved doing so." AR 31. Specifically, she noted that Dr. Jordison assigned GAF scores during the period from March 2011 to January 2012 that ranged from 57 to 61, indicating only mild to moderate limitations. *Id.* She also referenced Lopez's consistent reports that she loved her job and the boost to her self-confidence that it gave her.

Lopez argues Dr. Jordison's treatment notes are in fact consistent with her opinion, because Dr. Jordison indicated Lopez's condition waxes and wanes, which is evidenced by fluctuating GAF scores ranging from 45 to 59 during Dr. Jordison's treatment of Lopez over the entire, two-year period in the record. She also emphasizes that just because Dr. Jordison found Lopez capable of working part-time at a job that was slow-paced, did not involve confrontation and would allow Lopez to take frequent breaks when she experienced anxiety, does not mean that she would consider Lopez capable of full-time work.

I agree with Lopez's argument that the GAF scores were not a good reason for giving Dr. Jordison's opinion little weight. The ALJ's analysis of Lopez's GAF scores is incomplete and somewhat misleading. While it is true that Lopez's GAF scores ranged from 57 to 61 during one ten-month period, that represents only part of her treatment history with Dr. Jordison. Lopez began treatment in March 2010 (her alleged onset date), and from March to November 2010,[4] Lopez's GAF scores ranged from 45 to 57, indicating moderate to serious symptoms or difficulty in functioning. AR 628, 695-97, 749-60, 835-39. Therefore, Dr. Jordison's opinion that Lopez may have moderate to marked limitations in some areas of work-related functions is not as extreme and inconsistent with her treatment notes as the ALJ indicated. However, this does not end the analysis because I find that the ALJ's other reason for giving Dr. Jordison's opinion little weight is a good reason that is supported by substantial evidence.

_____

[4] Lopez was unable to continue therapy from November 2010 through March 2011 due to financial reasons.

The other reason is based on Lopez's demonstrated ability to maintain part-time work in a different work environment and her frequent expressions of job satisfaction in that environment. Part-time work is an appropriate factor for the ALJ to consider. *See* 20 C.F.R. §§ 404.1571, 416.971 ("Even if the work you have done was not substantial gainful activity, it may show that you are able to do more work than you actually did."). Dr. Jordison emphasized in her opinion that Lopez was unable to perform her previous full-time job in a fast food restaurant because it was fast-paced and stressful, which would cause Lopez to have pseudoseizures and miss work. AR 902-09. Dr. Jordison also acknowledged that Lopez had been successful at her part-time job at Dollar Tree where the issues from her previous job had not arisen. It was reasonable for the ALJ to give Dr. Jordison's opinion little weight to the extent it opined that Lopez was capable of performing only part-time work. There are many differences between the two jobs beyond just the number of hours worked. Lopez's success in her part-time work environment suggests that her limitations are not as severe as Dr. Jordison alleged and that Lopez is capable of performing other types of work with her impairments.

The ALJ's evaluation of Dr. Jordison's opinion as a treating physician is supported by substantial evidence in the record as a whole. Although her reasoning based on the GAF scores was flawed, her other reason based on Lopez's successful part-time work is supported by substantial evidence and is a good reason for discrediting Dr. Jordison's opinion as to the severity of Lopez's limitations.

Lopez also disagrees with the ALJ's assessment of the non-treating state agency consultants, specifically Jennifer Ryan, Ph.D., and Scott Shafer, Ph.D., who evaluated Lopez's mental impairments. Besides arguing that their opinions are generally entitled to less weight than those of a treating physician, she also argues that they misconstrued certain evidence in the record. The Commissioner argues the ALJ properly gave these opinions significant weight because they are consistent with the record as a whole and were based on a thorough review of the record.

16

"[T]he opinions of nonexamining sources are generally, but not always, given less weight than those of examining sources." *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008). "[B]ecause nonexamining sources have no examining or treating relationship with [the claimant], the weight [the Commissioner] will give their opinions will depend on the degree to which they provide supporting explanations for their opinions." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). "[A]n ALJ may credit other medical evaluations over that of the treating physician when such other assessments are supported by better or more thorough medical evidence." *Prosch*, 201 F.3d at 1014 (internal quotations and citations omitted).

In her mental RFC assessment dated September 8, 2010, Dr. Ryan found Lopez had moderate limitations in the following areas: ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes and respond appropriately to changes in the work setting. AR 769-70. In the narrative portion of her assessment, Dr. Ryan summarized Lopez's mental health treatment. AR 771. She also considered a work performance assessment (WPA) dated April 28, 2010, from Lopez's supervisor at Hardee's, which contained generally poor to very poor ratings, except in the categories of ability to follow rules, general appearance and ability to interact with others in the work place. These were described as "adequate." *Id*. The supervisor commented that Lopez lacked motivation overall and she would only rehire her if her health improved. *Id*. Dr. Ryan noted most of the reported job difficulties appeared to be related to Lopez's physical condition. *Id*. Dr. Ryan concluded that Lopez was able to carry out simple instructions and perform simple, routine, repetitive work tasks in work environments with consistent work expectations. AR 772.

Dr. Shafer reviewed Dr. Ryan's assessment on December 17, 2010. AR 824. At that time, the record indicated Lopez continued to experience pseudoseizures. *Id.* Dr. Shafer noted that another WPA was added to the record from the same supervisor which again showed poor marks in several areas, but also that Lopez had been given special considerations at that job. *Id.* The supervisor noted Lopez lacked motivation and did not offer an opinion as to whether Lopez would be capable of full-time work. Dr. Shafer affirmed Dr. Ryan's assessment as written. *Id.* The ALJ noted that both of these opinions were considered as those of non-treating specialists, but because they were generally consistent with the record as a whole, they were given significant weight. AR 29-30.

Lopez argues that Dr. Ryan (a) failed to note that numerous sub-50 GAF scores reflected serious impairments and (b) misread or misunderstood the WPA dated April 28, 2010, so her opinion is not consistent with the record. Dr. Ryan performed her assessment on September 8, 2010. AR 771. Prior to that date, only three records contained sub-50 GAF scores. AR 628, 697, 695. Dr. Ryan's narrative assessment states that she considered all of these records. AR 771. As a specialist, Dr. Ryan surely understands the significance of a GAF score below 50, but she is also responsible for reviewing the entire record. Dr. Ryan noted that Lopez had reported significant situational stressors at the beginning of her treatment involving her physical impairments, work problems after a recent work injury, and issues with her husband. *Id.* It was not inconsistent with the record for her to conclude that Lopez did not have serious impairments based solely on three sub-50 GAF scores toward the beginning of her treatment.

Dr. Ryan also did not misread or misunderstand the WPA by stating that it reflected job difficulties that were largely related to Lopez's physical condition. During Lopez's time at Hardee's she experienced pseudoseizures, which is a physical condition (although it may be triggered by stress as Dr. Jordison later opined). AR 640-41, 744, 759, 903. Regardless of how Dr. Ryan characterized Lopez's job difficulties, she

18

incorporated many of the mental limitations identified in the WPA into her RFC assessment. The areas she marked as moderate limitations were similar to the areas marked as "poor" in the WPA. Consistent with these findings, Dr. Ryan concluded that Lopez would be able to carry out simple instructions and perform simple, routine, repetitive work tasks in work environments with consistent work expectations.

Dr. Ryan's opinion is supported by substantial evidence in the record as a whole. She was required to review all the evidence in the record at the time of her assessment. She gave the WPA appropriate weight in the context of the overall record and reasonably found that Lopez was not precluded from all work simply because she struggled in one particular work environment. The mental limitations she identified are consistent with the WPA and substantial evidence in the record as a whole.

Finally, Lopez challenges the ALJ's evaluation of the opinion of Alejandro Tobon, M.D. Dr. Tobon is a neurologist who saw Lopez after she passed out during a dental appointment. AR 572-73, 577-78, 658-59. On March 16, 2010, Dr. Tobon performed tests and diagnosed her with pseudoseizures as there were no abnormal neurological results. AR 577-78. On March 18, 2010, he referred her to James Burr, MS, for a psychiatric consultation and also wrote her a work release stating that he felt she could resume normal activities on March 22, 2010. AR 574-74, 624. Lopez argues the ALJ misused and distorted Dr. Tobon's findings in her decision.

The ALJ discussed Dr. Tobon's findings in relation to the opinion of the state agency medical consultant, Melodee Woodard, M.D., who reviewed the evidence relating to Lopez's physical limitations. AR 26-28. Specifically, Dr. Woodard had considered the opinion of a consultative examiner, Michael W. Stitt, M.D., who opined that Lopez was unable to bend, lift, twist, climb, stoop, kneel, or lift/carry any weight, even though he also found that Lopez's range of motion was essentially normal. AR 26. Dr. Woodard (and the ALJ) gave this opinion little weight based on this inconsistency. The ALJ noted that Dr. Woodard had given great weight to Dr. Tobon's opinion that Lopez could "resume normal activities" with no mention of any

19

restrictions. AR 28. The ALJ found Dr. Woodard's opinion consistent with the record as a whole and gave it some weight based on her own review of the record, which she thought indicated that Lopez's obesity caused greater limitations than identified by Dr. Woodard. *Id.*

The ALJ used more than a page of her decision to summarize Dr. Woodard's findings. Clearly, Dr. Woodard's assessment and the ALJ's decision were based on more than Dr. Tobon's work release in determining Lopez's physical limitations. AR 26-28. The ALJ did not err in considering this aspect of Dr. Woodard's assessment as she is required to consider all of the evidence in the record in determining Lopez's RFC. *See Goff*, 421 F.3d at 793 ("The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'"). Dr. Woodard's assessment of Dr. Tobon's work release and other medical records is consistent with substantial evidence in the record. The ALJ did not err in giving Dr. Woodard's opinion some weight after her independent review of the entire record.

The ALJ adequately evaluated the medical opinions in the record. She provided a good reason for not giving Dr. Jordison's opinion controlling weight. She also provided good reasons for the weight she gave to all of the medical opinions. Those reasons, and the limitations she adopted from the medical opinions, are supported by substantial evidence in the record as a whole.

## B.    *Claimant's Credibility*

Lopez argues the ALJ erred in her credibility determination by discrediting Lopez based on her application for unemployment benefits and evidence that Lopez was being considered for a promotion at her part-time work. In discussing Lopez's credibility, the ALJ found it significant that Lopez had received unemployment compensation after her alleged onset date because this required her to assert that she

was able to work, was available for work, and was earnestly and actively seeking work. AR 32. The ALJ explained that Lopez's application for unemployment compensation constituted an admission against Lopez's interests of claiming inability to work because of a medically determinable physical or mental impairment. She also noted that this factor did not prove by itself that Lopez was not disabled, but it was compelling and seriously undermined her assertion that she was incapable of working in competitive employment. *Id.* (citing *Johnson v. Chater*, 108 F.3d 178 (8th Cir. 1997)).

"Applying for unemployment benefits may be some evidence, though not conclusive, to negate a claim of disability." *Johnson*, 108 F.3d at 180-81. *See also Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1998) (stating "the acceptance of unemployment benefits, which entails an assertion of the ability to work, is facially inconsistent with a claim of disability," but noting the ALJ cannot base an adverse credibility finding on this fact alone). While it was not error for the ALJ to consider Lopez's application for unemployment benefits, Lopez argues the ALJ placed too much emphasis on this factor in contravention of the current policy of the Social Security Administration, as outlined in a memorandum dated August 9, 2010, from Chief Administrative Law Judge Frank A. Cristaudo to all administrative law judges. *See* Doc. No. 13-1 at 3.

Judge Cristaudo's memorandum (the Memo) references Social Security Ruling 00-01c, 2000 WL 38896 (Jan. 7, 2000), and *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795 (1999), which discuss the intersection of claims under the Social Security Act and the Americans with Disabilities Act. In *Cleveland*, the Supreme Court held that claims under the Social Security Act and the Americans with Disabilities Act do not conflict to the point where courts should apply a special negative presumption that precludes relief under the other Act. *Cleveland*, 526 U.S. at 802-03. In other words, it is not entirely inconsistent for a person to assert "total disability" under the Social Security Act while asserting he or she could "perform the essential functions of the job" under the ADA because the Acts utilize different standards. *Id.* at 807. For the

21

same reasons, the Memo states, "[I]t is SSA's position that individuals need not choose between applying for unemployment insurance and Social Security disability benefits." Doc. No. 13-1 at 3. The Memo reiterates that an application for unemployment benefits is evidence that the ALJ must consider together with all of the other evidence and mentions that the underlying circumstances are often more relevant than the mere application for and receipt of benefits.

I find that the ALJ did not place too much weight on Lopez's application for unemployment benefits and that her consideration of this factor is consistent with the policy and principles set forth in the Memo. Not only has Lopez held herself out as being able to work in applying for unemployment benefits, but she has actually worked, albeit a part-time job. This underlying fact was included in the ALJ's credibility analysis. She reasoned that although Lopez's part-time work did not amount to substantial gainful activity, it did indicate that Lopez's daily activities were, at times, greater than she generally reported. AR 33. *See Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility."). Applying for and receiving unemployment compensation as well as maintaining a part-time job were appropriate reasons for the ALJ to discredit Lopez's allegations.

The ALJ also discredited Lopez based on evidence that she was being considered for a promotion at her part-time job at Dollar Tree. At the hearing, Lopez testified a promotion to assistant manager consisted of duties such as overseeing product placement in the store and completing paperwork related to the till. AR 54. In her decision, the ALJ discussed Lopez's work at Dollar Tree. AR 31. Although Lopez claimed she received accommodations at this job due to her impairments, the ALJ found this was unlikely since she had recently been considered for a promotion. The ALJ stated, "If the claimant [was] really as anxious and stressed at work as she alleged, it appears that she would likely not even consider such a position." AR 31. Ultimately, Lopez was not offered the position, as she explained in a letter she

22

submitted to the Appeals Council.[5]  AR 309-10.  In that letter, she stated that the manager told her she was qualified for the job, but he felt that it was best for her to continue as a cashier because he knew that stress and more hours of work would increase her anxiety.  *Id.*  Lopez argues the ALJ's decision to discredit her based on this potential promotion is not supported by substantial evidence, especially considering the new evidence she submitted to the Appeals Council.

I must decide "whether the [ALJ]'s determination is supported by substantial evidence on the record as a whole, including the new evidence submitted after the determination was made."  *Riley v. Shalala*, 18 F.3d 619, 622 (8th Cir. 1994).  I find that it is.  The new evidence, even when considered most favorably to Lopez, does not establish that she is unable to perform *all* work, only the work of an assistant manager.  Indeed, Lopez states in the letter that she is one of the best cashiers in her store.  Nor does the new evidence affect the ALJ's reasoning for discrediting her.  The ALJ determined that it was inconsistent for Lopez to apply for an assistant manager position while asserting that her regular job duties cause a disabling level of stress and anxiety.  The fact that Lopez did not get the job has no bearing on the ALJ's finding that her application for the promotion was inconsistent with her claim of disability.  This was an appropriate reason for the ALJ to discredit Lopez's subjective allegations.  *See Johnson*, 240 F.3d at 1148 ("Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility.").  This reason is supported by substantial evidence in the record, including the new evidence submitted to the Appeals Council.

The ALJ provided good reasons for discrediting Lopez's subjective allegations. The ALJ only discredited Lopez to the extent that she alleged her impairments prevented her from performing all work activity.  The ALJ credited several limitations that were supported by substantial evidence in the record and included those limitations

---

[5] Although this ultimately does not affect my analysis, I note that the letter is an unsworn statement by Lopez that is not corroborated by any other evidence in the record.

in the RFC determination. The ALJ's credibility analysis and RFC determination are supported by substantial evidence in the record as a whole.

## C.    *Hypothetical Question to the VE*

Lopez argues the ALJ's hypothetical question to the VE was flawed because it did not encompass limitations identified by Lopez's treating physicians or those that were alleged by Lopez and should have been credited. The ALJ's first hypothetical included no physical limitations, except that she would need to avoid hazards such as heights and machinery. AR 62. The individual would be able to do only low stress occupations with only occasional changes in the work setting. *Id.* The VE responded that no past relevant work was compatible with this hypothetical. AR 63. The ALJ's second hypothetical added a limitation of simple routine tasks in addition to the other limitations. *Id.* The VE responded that the position of a hospital food service worker would be appropriate with these limitations. *Id.* The ALJ added the limitation that the individual could have short lived superficial contact with the public, co-workers and supervisors. AR 64. The VE concluded that work as a produce packer and salvage laborer would be appropriate. *Id.* Finally, the ALJ added physical limitations of light work. *Id.* The VE testified that work as a hotel maid, bench assembler and marker would be appropriate with all of these limitations taken together. AR 64-65.

The ALJ's hypothetical question to the VE must include those impairments that the ALJ finds are substantially supported by the record as a whole. *Buckner v. Astrue*, 646 F.3d 549, 561 (8th Cir. 2011). The hypothetical should capture the concrete consequences of the claimant's impairments. *Id.* "[A]n ALJ may omit alleged impairments from a hypothetical question posed to a [VE] when '[t]here is no medical evidence that those conditions impose any restrictions on [the claimant's] functional capabilities.'" *Owen v. Astrue*, 551 F.3d 792, 801-02 (8th Cir. 2008) (quoting *Haynes v. Shalala*, 26 F.3d 812, 815 (8th Cir. 1994)).

24

I have previously determined that the ALJ's reasons for discrediting part of Dr. Jordison's opinion and Lopez's subjective allegations are supported by substantial evidence in the record as a whole. The ALJ included all of Lopez's credible limitations in the RFC assessment. Those limitations are identical to the ones in the hypothetical question to the VE. AR 24-25, 62-65. Because the hypothetical question included all of Lopez's credible limitations, the VE's testimony that Lopez could perform other work available in the national economy is supported by substantial evidence in the record. The ALJ did not err in relying on this testimony to determine that Lopez was not disabled under the Act.

## Conclusion

After a thorough review of the entire record and in accordance with the standard of review I must follow, I conclude that the ALJ's determination that Lopez was not disabled within the meaning of the Act is supported by substantial evidence in the record. Accordingly, the decision of the ALJ is **affirmed** and judgment will be entered in favor of the Commissioner and against Lopez.

**IT IS SO ORDERED.**

**DATED** this 13th day of August, 2013.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE